## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **8:08CR210** |
| Plaintiff, | ) | |
| | ) | **REPORT AND** |
| v. | ) | **RECOMMENDATION** |
| | ) | |
| TERRY RAY BAIN, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion to suppress filed by Terry Ray Bain (Bain).  Filing No. 25.  Bain is charged in a seven-count Indictment (Filing No. 1) with violating 18 U.S.C. §§ 371, 2312, 2313, 2314, and 2315, by conspiring to receive, possess, and transport, and receiving, possessing, and transporting stolen property and motor vehicles over state lines, and selling the stolen property in the State of Nebraska.  Bain is further charged with two counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).  The indictment seeks forfeiture of Bain's firearms pursuant to 18 U.S.C. §§ 924(d) and 2461(c).  **See also** Superseding Indictment, Filing No. 74.

## BRIEF SUMMARY OF FACTS

The facts of this case are complex and are briefly summarized to provide context.

At approximately 7:00 a.m. on July 20, 2007, Lena Swanson (Swanson), Bain's employee, was driving a silver Dodge pickup pulling a livestock trailer northbound on Colorado Highway 71 when she drove off the road.  The silver pickup and trailer rolled to the bottom of the 40-foot-deep ditch on the east side of the road.  The livestock trailer, manufactured by Banens, contained several items of equipment, including three ATVs. Swanson had been following Bain, who was driving a white Chevrolet pickup pulling a gooseneck flatbed trailer manufactured by TopHat.  A bumper-pull trailer manufactured by HaulRite and a John Deere skid steer were being transported on the TopHat trailer.

When a Colorado State Patrol (CSP) trooper arrived at the accident scene, no one was there.  Bain and Swanson returned to the accident site approximately twenty minutes after the trooper arrived and answered the investigating officer's questions.  Additional

officers arrived at the scene at approximately 9:30 a.m.   Bain responded to the investigating officers' questions and provided documents.   The officers investigated the vehicles and equipment at the site until approximately 2:00 p.m., and during the course of that investigation, uncovered facts indicating the vehicles, trailers, and property being used and/or hauled by Bain and Swanson may be stolen.   The Colorado communication center accessed the NCIC database, and reported and confirmed the John Deere skid steer was stolen.

Bain was arrested at 2:10 p.m. on July 20, 2007, for receipt of stolen property. When Bain was pat-searched for booking into jail, the deputy found drug paraphernalia, including tin foil and a glass pipe, on Bain's person.

CSP advised the Nebraska State Patrol (NSP) on July 20, 2007, that Bain, who lived on a farm near Maxwell, Nebraska, had been arrested for receipt of stolen property.   NSP flew over Bain's ranch and took aerial photographs.

CSP searched Bain's white Chevy pickup pursuant to a warrant on July 24, 2007, and shared the information found with NSP on July 26, 2007.

NSP obtained and executed a warrant to search Bain's ranch on August 1, 2007. During the course of the search, stolen property was found and Bain provided statements to NSP officers.

With the consent of the state prosecuting attorney in Colorado, CSP officers photographed and returned the three trailers involved in the accident, and the three ATVs being hauled in the Banens livestock trailer, to their owners.

## SUMMARY OF DEFENDANT'S MOTION

Bain seeks to suppress the following:

> -- All evidence obtained as a result of the warrantless search of Bain's gray/silver Dodge Ram pickup truck and his white Chevrolet pickup truck on July 20, 2007;

> -- All statements made by Bain to CSP Troopers Mark J. Amos and Craig Harris, Investigator Steve Jeffries, and Captain Doug Copley on July 20, 2007;

-- All evidence taken from and/or provided by Bain to CSP Officers on July 20, 2007, including but not limited to a handwritten receipt from Moore and Molias Equipment dated July 17, 2007, a check from Steve Ries for the purchase of a Miller Bobcat Welder, a check from Rhonda Battaglia, a glass pipe in a one gallon bottle of water found in the white Chevrolet pickup truck, a white envelope containing a glass pipe and tin foil seized from Bain at the Washington County, Colorado jail, and "all documents, notes and miscellaneous paperwork contained in the discovery produced by the U.S. Attorney at pages Bates Numbered 342-384;"

-- All observations made during a warrantless flyover of Bain's Nebraska property by the NSP Air Wing on July 20, 2007;

-- All items observed or seized pursuant to CSP's search of Bain's Chevrolet pickup on July 24, 2007, pursuant to a warrant;

-- All items observed and seized during the execution of a warrant to search Bain's residence on August 1, 2007; and

-- All statements made by Bain to Sergeant B.J. Edins and other law enforcement officers during and after the execution of the warrant to search Bain's residence and property on August 1, 2007.

**See** Filing No. 25.

Citing ***Daubert v. Merrill Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993)**, Bain also claims the government's witnesses were not qualified to testify that any painting, grinding, or sanding observed on July 20, 2007, had been recently performed. **See** Filing No. 81. Finally, Bain claims the government has failed to keep the trailers and ATVs found at the accident site in its possession, making it impossible for Bain or a jury to independently evaluate the officers' claims. **See** Filing No. 81.

3

## LISTING OF EVIDENCE

An evidentiary hearing was held on December 3 and 4, 2008.  The transcript of the hearing was filed on December 23, 2008 (Filing Nos. 64 (TR. 64) & 65 (TR. 65)).  The court heard the testimony of government witnesses, Mark Amos, Richard Harris, Steve Jeffries, Brian Edins, and Clint Elwood.  Mark Amos (Trooper Amos), Richard Harris (Trooper Harris), and Steven Jeffries (Investigator Jeffries) are CSP employees.  With the exception of a seven-month hiatus to pursue a cattle feedlot management career, Trooper Amos has been a CSP road trooper since January 1987 (TR. 64, 59-61).  Trooper Harris and Investigator Jeffries have been CSP employees since 1991 (TR. 64, 182; TR. 65, 270).  Trooper Harris has been a trooper since his CSP employment began; Investigator Jeffries was a trooper until he became a CSP investigator in January 2007 (TR. 64, 182; TR. 65, 270).  A CSP trooper enforces Colorado  traffic laws, investigates traffic accidents and suspected criminal activity, and assists the public on Colorado roadways (TR. 65, 271).  A CSP investigator assists troopers with non-traffic felony cases, including auto theft cases, encountered on the highways (TR. 65, 272, 291).

Troopers Amos and Harris, and Investigator Jeffries received specialized training to locate, identify, and investigate the vehicle identification number (VIN) affixed to vehicles, and are certified VIN inspectors (TR. 64, 198; TR. 65, 272-73).  Trooper Amos has been a member of the Colorado Auto Theft Investigators since 2000 (TR. 65, 259).  Investigator Jeffries and Trooper Harris have been members of Colorado Auto Theft Investigators since 1993 and 1994, respectively (TR. 64, 183-84; TR. 65, 273-74).  Trooper Harris became a member of the International Auto Theft Investigators in 2007 (TR. 64, 183-84).

Brian Edins (Sergeant Edins) and Clint Elwood (Investigator Elwood) are NSP employees.  Trooper Edins became an NSP trooper in 1995, and was a police service dog handler until 2004 (TR. 65, 296-97).  Beginning in 2004, Sergeant Edins performed narcotics investigations for two and one-half years, and was then promoted to sergeant-in-charge of criminal investigations for NSP Troop D headquartered in North Platte, Nebraska.  Sergeant Edins received general training on investigating stolen property crimes through the NSP Training Academy (TR. 65, 297).  Investigator Elwood began his

4

NSP career as a trooper in 2002, and was an NSP criminal investigator at the time of the evidentiary hearing (TR. 65, 352-53).

Forty-four government exhibits were received into evidence at the hearing on Bain's motion to suppress, including: a highway map of the accident area (Exhibit 1); photographs of the vehicle and trailer damaged in the accident (Exhibits 2-6, 8, 9); photographs of specific parts and locations on the Banens stock trailer (Exhibits 7, 10, 10A, 10B); photographs of the three Kawasaki ATVs located at the accident site, and the ignition switch area of these ATVs (Exhibits 11-19); photographs of all or part of Bain's white Chevrolet pickup, and the HaulRite and TopHat trailers being towed by the pickup (Exhibits 20-23, 25-28); photographs of the John Deere skid steer and its product identification number (Exhibits 24A & 24B); a Moore and Molias Equipment receipt (Exhibit 29); the Colorado warrant application, affidavit, search warrant, and return for the search of Bain's white Chevrolet pickup (Exhibits 30-31); a Cowboy Country Sales inventory sheet (Exhibit 32); aerial photographs of Bain's Nebraska ranch (Exhibits 33-34); the Nebraska warrant application, affidavit, search warrant, and return for the search of Bain's ranch (Exhibits 35-36); photographs of property found during the search of Bain's ranch (Exhibits 42-44); checks written to Bain and found during the search of Bain's white Chevrolet pickup (Exhibit 41); a District Attorney memorandum authorizing the return of stolen property to the owners (Exhibit 45); and an appearance bond issued for Bain by the District Court of Washington County, Colorado dated July 24, 2007 (Exhibit 46).

The court also received four exhibits on Bain's behalf:  an audit trail dispatch log document (Exhibit 101); a license plate report (Exhibit 102); a communications center report (Exhibit 103); and a cell phone bill (redacted) (Exhibit 104).

Bain filed post-hearing briefs on January 26, 2009.  **See** Filing Nos. 79 & 81.  The government filed its post-hearing brief on February 19, 2009.  **See** Filing No. 85.  Bain's motion to suppress is now fully submitted.

Bain claims the warrantless search of his vehicles, trailers and property located at the accident site, and the warrantless flyover of his property on July 20, 2007, violated the Fourth Amendment.  Bain further argues he was illegally detained, and the statements he made in response to questioning by CSP officers on July 20, 2007, and to Sergeant Edins

on August 1, 2007, are fruit of the illegal vehicle searches, and his Fifth and Sixth Amendment rights were violated by these custodial interrogations.  Bain claims the warrants executed to search his residence on August 1, 2007, and his white Chevrolet pickup on July 24, 2007, were tainted by and relied upon fruit of the warrantless searches, seizure, and unlawful interrogation of Bain on July 20, 2007.  **See** Filing No. 25.

## FINDINGS OF FACT

At 7:00 a.m. on Friday, July 20, 2007, Trooper Amos was dispatched to the location of a one-vehicle rollover crash approximately five miles south of Last Chance, Washington County, Colorado on Highway 71.  Trooper Amos was the only trooper assigned to patrol the reported location of the crash, and was at his home in Cope, Colorado, forty-five miles from the accident scene, when he received the dispatch call (TR. 64, 80-81; Ex. 1).  Highway 71 in Washington County, Colorado passes through a desolate, rural area of rolling hills and pasture ground.  It has one northbound and one southbound lane, and a minimal foot-wide grassy shoulder (TR. 64, 84).  The dispatcher stated the party who reported the accident had no cell coverage at the accident location and had therefore left the scene to make the call (TR. 64, 81).

Trooper Amos arrived at the scene in his marked patrol vehicle and parked on the northbound shoulder at approximately 7:45 a.m. (TR. 65, 212).  No one was present at the accident site (TR. 64, 81, 87).  The accident happened near an elevated portion of Highway 71, with ditches approximately forty feet deep (TR. 64, 85).  Looking down from the roadway, Trooper Amos saw a silver Dodge pickup and a stock trailer containing equipment that had rolled down the forty-foot embankment of the east ditch (TR. 64, 85).  The pickup was upside down facing west, and the trailer had landed on its right side (TR. 64, 86).

The initial responsibility of CSP troopers responding at an accident scene is to locate and summon medical care, as necessary, for any injured persons (TR. 64, 72).  If no one is present at the scene when the trooper arrives, the scene and vehicles are thoroughly searched to make certain no one has been ejected from the vehicle or is trapped in or under the vehicle (TR. 64, 73).  Trooper Amos approached the accident

rubble at the base of the forty-foot embankment and began looking for people in need of assistance.  He found no one (TR. 64, 88).

Trooper Amos continued to investigate the scene to figure out what had happened and who was involved.  He noticed there were no license plates or temporary tags on the silver pickup (TR. 64, 88; TR. 65, 220).  The officer proceeded to search for the pickup's VIN (TR. 64, 89).  Motor vehicle manufacturers attach VINs to the vehicles sold in the United States.  A VIN is a seventeen-character number which identifies where and when a vehicle was built, and the vehicle specifications.  The last six or seven characters (digits) of a VIN identify, or serve as a "fingerprint," for the specific vehicle on which it is affixed (TR. 64, 61-63).  Public VINs on motor vehicles are located on the driver's side dash near the bottom of the windshield and can typically be seen through the windshield (TR. 64, 63-64).  However, the front windshield of the silver pickup was broken and Trooper Amos could not see the VIN on the lower left dashboard (TR. 64, 89).

In a continued effort to identify the owner of the vehicle, Trooper Amos searched the glove compartment of the pickup where people often store their vehicle registration documents.  Inside the glove compartment, the trooper located a vehicle data plate with a secondary VIN (TR. 64, 89).  Manufacturers affix data plates on motor vehicles and trailers to identify the manufacturer, and describe, for example, the axle and tire capacity, tire pressure, and applicable patents for the vehicle or trailer to which they are attached (TR. 64, 67-68).  Secondary VINs, which are often found in a vehicle's glove compartment or on its doors, include all the characters of the public VIN (TR. 64, 63-64, 89-90).

While searching the glove compartment, Trooper Amos saw a western saddle and a lady's purse in the vehicle cab.  The trooper was still trying to identify who was driving the silver pickup when it left the road, so he searched the purse.  He found a wallet containing Swanson's Nebraska driver's license, which included Swanson's picture (TR. 64, 90).

Trooper Amos then began inspecting the Banens twenty-four-foot gooseneck livestock trailer (the Banens trailer) which was being pulled by the silver pickup when the pickup left the road (TR. 64, 92, 94, 97; Ex. 4).  He located the Nebraska registration on the trailer, but did not find the trailer's VIN or data plates.  Instead, the officer saw rivet holes where the VIN data plates likely were at one time (TR. 64, 94, 97-98; TR. 65, 241-42;

7

Exs. 10A & 10B).  Depending on the manufacturer, VIN plates can be glued, riveted or welded to a vehicle or trailer (TR. 64, 67, 185).  The detached VIN and data plates were not found at the accident site (TR. 64, 99-100).

Once CSP troopers retrieve identifying documents such as drivers' licenses, vehicle registrations, and VINs, they use this information to contact the communications center in Denver and determine if the drivers' licenses are valid, and the vehicles are properly licensed and not reported as stolen (TR. 64, 74-75).  CSP troopers also request a "clearance," meaning a National Crime Information Center (NCIC) check for wants and warrants for those persons involved in the accident, and can request an NCIC check to determine if vehicles and equipment involved in an accident have been reported as stolen (TR. 64, 76-77).  NCIC responses are sent to the Colorado Crime Information Center, (CCIC), which forwards the information to the Denver Communications Center and on to the troopers in the field (TR. 64, 77).  Communications dispatchers are contacted by troopers, including Trooper Amos, through the use of digital radios or laptop computers with wireless internet located within the patrol vehicle, or with the officer's personal cell phone (TR. 64, 75-76, 79-80).

Trooper Amos climbed the ditch embankment to reach his patrol vehicle and call in Swanson's driver's license, the VIN number of the silver pickup, and the license plate of the Banens trailer.  Dispatch reported the driver's license was clear and there were no outstanding wants or warrants for Swanson.  The VIN search for the silver pickup revealed it was registered in Nebraska and owned by Bain.  Dispatch located no record of the Banens trailer, which is not uncommon when searching the databases for trailer records (TR. 64, 102-103).

Trooper Amos again descended into the ditch to further investigate the wreckage.  At approximately 8:00 a.m., he noticed a male and a female standing by the officer's patrol vehicle and watching him from the roadway surface above (TR. 64, 104; TR. 65, 212, 214).  They had apparently arrived at the location in a white Chevrolet pickup, with the logo "Plummer Cattle Company, Laveen, Arizona" and a phone number printed on the side.  The pickup was pulling a heavy duty, 28-foot flatbed trailer.  A small bumper-pull trailer and John Deere skid steer loader were located on the flatbed trailer.  The white pickup and the trailer

rig it was hauling were parked on the southbound shoulder of Highway 71 (TR. 64, 105, 114-15; TR. 65, 213).  The officer climbed the embankment to speak with the male and female (TR. 64, 104).

Trooper Amos asked the male, later identified as Bain, if he knew anything about the accident.  Bain responded that the female, later identified as Lena Swanson, was the driver (TR. 64, 105; TR. 65, 215).  Trooper Amos asked Swanson if she needed any medical attention.  Swanson declined (TR. 65, 215).  The officer asked Bain and Swanson where they had been, and they explained there was no cell service at the accident site.  Bain and Swanson had driven the white pickup and the trailer rig attached onto Highway 36 near Last Chance until there was cell coverage, parked to place the call, and reported the accident from that location (TR. 64, 173-74).  Trooper Amos later realized he had passed the white pickup and attached trailer while en route to the accident site (TR. 64, 174; TR. 65, 211).

Swanson accompanied Trooper Amos to the officer's patrol vehicle and sat inside while Trooper Amos asked questions and completed an accident report (TR. 64, 105, 107).  Swanson stated she was employed by Bain.  Swanson said she had driven with Bain to Arizona with two horses, Swanson had shown the horses, the horses were sold, and Bain had purchased equipment in Arizona which was being transported back to Nebraska.  (TR. 64, 107-10; TR. 65, 238-39).  Swanson explained she had driven off the right side of the road while driving the silver pickup northbound in darkness and heavy fog, and was unable to bring it back onto the road.  The pickup and its attached trailer rolled down the ditch embankment (TR. 64, 106; TR. 65, 216).  Swanson stated the silver pickup was owned by "Terry" (TR. 64, 108).  When asked why the silver pickup had no license plates, Ms. Swanson stated "Terry" had the vehicle paperwork (TR. 64, 109).

While Trooper Amos was speaking with Swanson, Bain had driven the white pickup and trailer rig a half mile south to a location where he could turn around.  Bain turned around and drove north, and parked in a dilapidated corral area 500 yards north of the accident site to alleviate congestion on the narrow roadway (TR. 64, 107-08; TR. 65, 213, 215-17).  After the white pickup and trailer were moved, Bain began walking back toward the accident site and Trooper Amos (TR. 65, 217).  Trooper Amos exited the patrol vehicle and approached Bain to confirm Swanson's version of the events, and determine if Bain

9

was the actual owner of the damaged vehicle, trailer, and its contents (TR. 64, 109-10). Swanson remained in Trooper Amos's patrol vehicle (TR. 64, 128).

Trooper Amos asked Bain for identification and Bain produced a Nebraska driver's license (TR. 64, 110). Trooper Amos asked about the origin, purpose, and destination Bain's and Swanson's trip, and how the accident occurred. Bain's responses were consistent with Swanson's (TR. 64, 110). The officer then asked who owned the silver pickup. Bain originally stated Swanson owned the pickup, but when confronted with Swanson's contradictory statement, Bain ultimately admitted he owned the silver pickup. Bain explained that the title was being held by a bank in Maywood, Nebraska, and the vehicle registration had expired (TR. 64, 110-11; TR. 65, 219). Bain explained he intended to sell the vehicle to Swanson and Swanson was test driving it, but no money had changed hands (TR. 65, 219-20).

Trooper Amos offered to call a tow truck, but Bain rejected this offer, stating he had already called his son-in-law who lived in the Sterling, Colorado, area for assistance (TR. 64, 112). Bain began unloading the John Deere skid steer from the flatbed trailer behind the white pickup to begin clearing the accident site. John Deere skid steers are commonly used in construction work to move materials to and around the job site (TR. 64, 68, 112).

While Bain was unloading the John Deere skid steer, Trooper Amos was standing at the right front corner of the flatbed trailer attached to the white pickup (later determined to be a "TopHat trailer"). The officer looked up at the neck-over area of the trailer's gooseneck where data plates and decals are normally affixed by the manufacturer. Trooper Amos saw no plates or decals. Instead, he saw swirl marks from an apparent sanding and what appeared to be new paint, and he smelled the odor of fresh paint (TR. 64, 113). The officer looked at the small bumper-pull (piggyback) trailer (later determined to be a "HaulRite trailer") located on the TopHat trailer. In the location where a manufacturer data plate should have been, Trooper Amos saw a mix of rust and shiny metal indicating the area had been sanded or ground (TR. 64, 123-25; TR. 65, 242-43; Exs. 25-27).

CSP troopers are trained to recognize indicators of vehicle or equipment theft. Such indicators include crooked or scratched VIN plates, the appearance of shiny rivets or rosettes attaching the VIN plates, and the smell or appearance of fresh paint where a VIN

or product identification number (PIN) plate should or would likely be located (TR. 64, 70-71).[1]

At approximately 8:37 a.m., as Bain began clearing the accident site and Trooper Amos returned to his patrol vehicle to finish the accident report, Trooper Amos received a cell phone call from the communications center. According to the communications officer, an anonymous caller had called the communications center and asked the dispatcher to notify the trooper investigating the accident near Last Chance, Colorado, that the property at the scene was stolen (TR. 64, 125-26; TR. 65, 222-24; Ex. 101, p. 2). Trooper Amos contacted CSP Captain Doug Copely, explained the circumstances and the need for further investigation, and asked for additional trooper assistance for the safety of himself and the accident scene (TR. 64, 127; TR. 65, 225).

Captain Copely dispatched Trooper Harris and Investigator Jeffries to assist Trooper Amos. Captain Copely also contacted NSP Sergeant Edins in North Platte, Nebraska, and asked if Sergeant Edins was familiar with a person named Terry Bain from Maxwell, Nebraska. (TR. 65, 298-99). Maxwell, Nebraska, is thirteen miles east of North Platte, Nebraska, near mile marker 190 on Interstate 80 (TR. 65, 299). Sergeant Edins said he was familiar with Bain, and that Bain's name had surfaced in 2005 as a possible suspect for cattle and hay thefts in Lincoln County, Nebraska (TR. 65, 299-300). Captain Copely gave Sergeant Edins the number of the anonymous caller and asked if Sergeant Edins could trace its source. Sergeant Edins did not have access to phone number databases so he called the number twice. No one answered. Sergeant Edins left a message after the second call (TR. 65, 301).

While awaiting the arrival of additional law enforcement assistance at the accident site, Trooper Amos took measurements and performed other duties to complete his accident investigation. A brown Ford pickup arrived and parked near the white pickup. An

---

[1] CSP troopers are also trained to look for punched key locks as indicators of vehicle or equipment theft (TR. 64, 70-71). An ignition is "punched" by drilling a hole into and removing the key set. Once the key set is removed, a thief can start the vehicle or equipment with a screwdriver (TR. 64, 71-72). There is evidence in the record that the key sets for the three ATVs had been punched out, but there is no evidence explaining when Trooper Amos, or any other officer, first noticed the punched key locks. The pictures of the punched key locks were taken after the ATVs were in the Fort Morgan, Colorado, impound lot (TR. 64, 145-150; Exs. 11-19).

adult male and a boy exited the brown pickup.  Trooper Amos recognized the adult male as Nick Contreras, a person Trooper Amos had worked with while Trooper Amos was employed as a feedlot manager the year before.  Trooper Amos later learned the boy was Mr. Contreras's son (TR. 64, 129).  Trooper Amos spoke with Mr. Contreras and discovered Mr. Contreras was Bain's son-in-law.  Based on their prior working relationship, Trooper Amos trusted Mr. Contreras and told Mr. Contreras about the anonymous call.  He thanked Mr. Contreras for agreeing to help Bain and encouraged him to do so, but asked Mr. Contreras not to divulge the anonymous call to Bain.  Mr. Conteras agreed to keep the anonymous phone call secret, and did not tell Bain about the call (TR. 64, 130; TR. 65, 248).  Mr. Contreras assisted Bain in clearing the accident scene (TR. 65, 247).  During the cleanup, Bain placed the property located in the cab of the silver pickup into the cab of the white pickup (TR. 64, 162).

Bain and Mr. Contreras were clearing the site when Trooper Harris, Investigator Jeffries, and a Washington County sheriff's deputy from Akron, Colorado, arrived at the scene to assist Trooper Amos (TR. 64, 187).  Trooper Harris, who was stationed at Fort Morgan, Colorado, arrived in his patrol vehicle at approximately 9:30 a.m. (TR. 64, 130-31).  Investigator Jeffries, who was stationed at Limon, Colorado, and the Washington County deputy sheriff arrived within fifteen minutes thereafter (TR. 64, 131; TR. 65, 275).  Trooper Jeffries was in plain clothes and driving an unmarked Dodge Durango (TR. 65, 274).  Trooper Amos briefed the three officers together, explaining the information he received from Swanson and Bain, his observations of the vehicles and equipment, and the communications from dispatch, including the anonymous call (TR. 64, 132).

The white pickup, TopHat trailer, and HaulRite trailer were now in the ditch and, along with the John Deere skid steer, were being used to clear the equipment from the site.  Trooper Harris descended the embankment and began to look for VIN plates or manufacturer's stickers for the trailers.  Manufactured livestock and flatbed trailers are equipped with public VIN numbers, but the location of these numbers on the trailer is not consistent throughout the industry (TR. 64, 65-66, 200-01; TR. 65, 257).  When Bain approached Trooper Harris and asked what the officer was doing, Trooper Harris responded that he could not find any identifying information on the trailers and asked Bain if Bain knew

12

where the VIN plates were located.  Bain said he did not know the location of any VIN plates on the trailers, explaining that the trailers had been bought for him by a friend in Arizona and Bain was transporting the trailers to Nebraska (TR. 64, 190).

The license plate on the TopHat trailer was run by dispatch shortly after 9:30 a.m. (TR. 64, 191; TR. 65, 227; Exs. 22 & 102).  Dispatch reported the Arizona license plate on this manufactured trailer actually belonged on a homemade box trailer owned by a person named Klyn from Apache Junction, Arizona (TR. 64, 119-20, 191; TR. 65, 228).

Trooper Amos also ran the plates of the white pickup.  Dispatch reported the pickup was registered to "Joe Clem."  Since the vehicle had "Plummer Cattle Company" written on the side, and was being driven by Bain and not Joe Clem, Trooper Amos asked Bain to explain why he was driving the vehicle and for any documentation authorizing him to do so (TR. 64, 115-16; TR. 65, 244).  Bain produced an insurance card that appeared to be valid, a handwritten bill of sale, and an "open title" with a notarized seller signature but no buyer signature.  Open titles are illegal in Colorado.  The bill of sale indicated Joe Clem sold the vehicle to Bain (TR. 64, 116-18; TR. 65, 245-47).[2]

After receiving the dispatch report for the TopHat trailer, Trooper Harris helped Trooper Jeffries further investigate the damaged equipment loaded in the Banens trailer. This equipment included three ATV four-wheelers, a large Whisper Watt generator, a large sump pump, an air compressor, and some welding acetylene models.  Like Trooper Amos, Trooper Jeffries noticed the grind marks on the HaulRite trailer in the location where a manufacturer's sticker would likely be found (TR. 65, 279; Exs. 25-27).  Trooper Jeffries inspected the TopHat trailer, focusing his attention on the neck area where manufacturer's numbers are commonly found and like Trooper Amos, saw shiny black paint, smelled the odor of fresh paint, and it appeared the area had been chipped out and freshly painted (TR. 65, 281, 288).  Later, when the TopHat trailer was moved to Fort Morgan and positioned correctly in the sunlight, Trooper Jeffries could read "Top Hat" under the black paint (TR. 65, 282, 289).

---

[2] The record is not clear as to when, in the context of this investigation, Trooper Amos ran the plates of the white pickup.

Recently manufactured John Deere equipment, including John Deere skid steers, have an affixed plate identifying the PIN and bar code specific to that item of equipment (TR. 64, 68-69). PINs are essentially the same as VINs, except they are attached to equipment rather than motor vehicles (TR. 64, 69). Investigator Jeffries entered the Banens trailer to obtain VINs from two of the three ATVs inside the trailer.[3] Harris wrote down the PIN number for the John Deere skid steer and the VINs for the two ATVs. At approximately 10:35 a.m., Trooper Jeffries called the communications center and asked for an NCIC search of the PIN located on the John Deere skid steer and the VINs for the two ATVs. (TR. 64, 122, 133, 191-92; TR. 65, 229, 277, 283; Ex. 103).

The communications operator reported and confirmed the John Deere skid steer was reported as stolen out of Casa Grande, Arizona. Although the officers later discovered the ATVs had also been stolen, the ATV thefts had not been entered in the system and therefore the communications center did not report the ATVs as stolen when dispatch reported back to Investigator Jeffries.

Investigator Jeffries forwarded the dispatch information about the John Deere skid steer to Trooper Amos (TR. 64, 133; TR. 65, 229-30, 285, 293-95). At approximately 10:38 a.m., Trooper Amos told Bain about the anonymous call and allowed him to respond. The accident site cleanup was complete, and Mr. Conteras and his son had left (TR. 64, 137-38). Bain said he had no idea what the anonymous caller was talking about (TR. 64, 133-34). When Trooper Amos asked Bain if he had any paperwork showing he owned the equipment at the site, Bain stated he had a receipt for the damaged trailer and the property in that trailer. Bain walked to the white pickup unescorted and retrieved a handwritten receipt from Moore and Molias Equipment of Phoenix, Arizona. The receipt indicated nine items were sold to Bain for a total of $39,700 (TR. 64, 135-36, 157-58; TR. 65, 232; Ex. 29). Bain asked Trooper Amos to call Bill Plummer and Joe Clem, explaining they would confirm Bain was the owner of the property (TR. 64, 134, 157, 179-80). Trooper Amos stated he did not have their phone numbers. None of the law enforcement officers contacted Bill

---

[3] The remaining ATV could be safely accessed in the wreckage.

Plummer or Joe Clem, and they never attempted to contact Moore and Molias Equipment while at the accident site (TR. 64, 134, 137, 199-200; TR. 65, 233-34).

At approximately 11:15 a.m., Trooper Amos impounded the vehicles and property at the scene, and used his cell phone to call for a tow truck (TR. 65, 231-32, 262; Ex. 104). Trooper Amos advised Bain the property at the accident site was being impounded to investigate whether it was stolen, and instructed Bain to sit in Trooper Harris's vehicle while awaiting the arrival of the tow truck (TR. 64, 137-39; TR. 65, 231-32). The towing company was located in Yuma, Colorado, which was 90 miles away (TR. 64, 138-39). Bain was seated in the backseat of Trooper Harris's vehicle, and Trooper Harris sat in the front seat (TR. 64, 194-95). While Bain and the officers were waiting for the tow truck, Captain Copley delivered food and water to the scene (TR. 64, 138-40; TR. 65, 231, 250).

At 11:29 a.m., the communications center was called and asked to contact the Phoenix Police Department for information on Moore and Molias Equipment (TR. 64, 142-44; TR. 65, 235). Immediately thereafter, Trooper Amos used his personal cell phone to contact a tow truck and make arrangements for Swanson's mother to meet the officers at Akron, Colorado, so Swanson could go home (TR. 65, 235-36).

The tow truck arrived at approximately 1:30 p.m. and began preparing to tow or drive the vehicles and equipment to the CSP impound lot at Fort Morgan, Colorado. At approximately 2:00 p.m., the communications center reported that according to the Phoenix Police Department, Moore and Molias Equipment of Phoenix, Arizona, did not exist (Ex. 101 at p. 3).

At approximately 2:10 p.m., Bain was told he was under arrest for receipt of stolen property, placed in handcuffs, and transported to the Washington County Jail in Akron, Colorado, in Trooper Harris's patrol vehicle (TR. 64, 143-44, 194-96).

During the six hours between Bain's arrival at the scene and his arrest, Trooper Amos spoke with Bain for a total of ten minutes (TR. 64, 150-51). Bain was not questioned by Trooper Amos or Trooper Harris from the time he was seated in Trooper Harris's patrol vehicle until the time of his arrest (TR. 64, 144, 194-95). There is no evidence that Captain Copley ever spoke to Bain, and Investigator Jeffries never spoke to Bain (TR. 65, 285, 292).

During the investigation at the accident site, Bain did not appear to have any adverse medical conditions, and he did not appear to be under the influence of alcohol or drugs. He understood and conversed in English. Until Bain was directed to sit in Trooper Harris's vehicle, Bain was not told he must stay at the scene, and he was free to walk around the accident site without an escort. Bain was never verbally or physically threatened, and was not promised immunity or leniency for his cooperation. Bain never asked if he was a crime suspect, under arrest, or restricted from leaving, and he never asked for a lawyer (TR. 64, 151-56, 197).

Bain was placed in the Washington County Jail in Akron, Colorado (TR. 64, 167-69). When Bain was patted down during booking, the deputy found a folded foil paper and a glass pipe with burn stains indicative of methamphetamine inhalation in Bain's pocket (TR. 64, 196-97).

CSP Captain Copely contacted NSP Sergeant Edins during the afternoon of July 20, 2007, and told Sergeant Edins the John Deere skid steer had been reported by NCIC as stolen property. Sergeant Edins then contacted Sergeant Kevin Ryan with the NSP Air Wing stationed in Ogallala, Nebraska, to fly over Bain's ranch and take aerial photographs (TR. 65, 301-02). Sergeant Edins knew Swanson was en route back to Nebraska, and Sergeant Edins was concerned Bain may have called and asked someone to dispose of other stolen property located at Bain's ranch (TR. 65, 302-03).

Investigator Ryan flew over Bain's property on July 20, 2007, took photographs, and provided two of them to Sergeant Edins (TR. 65, 303-04; Exs. 33-34). One picture showed a light plant generator located in Bain's roping arena, and the other showed Bain's house and outbuildings with a pickup and flatbed trailer parked nearby (TR. 65, 308-10).

Trooper Amos and Investigator Jeffries completed an application to search the impounded white pickup on July 24, 2007, and submitted the application to Morgan County, Colorado, District Court Judge Vannoy for review. Judge Vannoy issued the search warrant on July 24, 2007, and the warrant was executed that day (TR. 64, 158-61; TR. 65, 285; Exs. 30-32). The officers collected and kept a page of yellow tablet paper with the listing of allegedly stolen items (Ex. 32), and collected and photocopied many other documents within the vehicle. The originals of the photocopied documents were returned to the white pickup

(TR. 64, 161-63, 172; TR. 65, 252, 255, 285-87).  Only the yellow notebook page was listed on the inventory sheet (TR. 65, Ex. 33).

Bain bonded out of the Washington County, Colorado, jail on July 24, 2007, at 3:10 p.m. (TR. 64, 167-69).

On July 26, 2007, Sergeant Edins traveled to Sterling, Colorado, to meet with Trooper Amos and Investigator Jeffries and review papers related to their investigation of Bain (TR. 65, 312).  Sergeant Edins looked at the Moore and Molias receipt, a Cowboy County inventory sheet (Ex. 32), and a sheet with copies of two checks found during the search of the white pickup cab (TR. 65, 312-14; Ex. 41).

Sergeant Edins returned to Nebraska and continued to investigate Bain (TR. 65, 319).  One of the checks provided by CSP was written to Bain by 4-S Ag Services in the amount of $1300.00, with "Welder Generator" written in the memo line (Ex. 41).  Sergeant Edins contacted Steve Ries, the owner/operator of 4-S Ag Services.  Ries stated he was on Bain's property while Bain was loading several items of equipment, including a welder, onto a trailer.  Bain was preparing to sell the equipment and Ries bought the welder.  Upon further investigation, Sergeant Edins discovered the welder was stolen (TR. 65, 317-18).

Sergeant Edins prepared a warrant application to search Bain's property on August 1, 2007.  The warrant application was reviewed by a county court judge for Lincoln County Nebraska, and a warrant was issued to search Bain's residence, and all buildings, outlying grounds, and pasture areas of the ranch (TR. 65,  319-21, Exs. 35-36).  Eight to ten law enforcement officers from various agencies met, were briefed, and executed the search warrant on August 1, 2007 (TR. 65, 322).  The search party arrived at Bain's residence at approximately 10:15 a.m., stationed themselves at the entrances of the house, knocked, and announced they were law enforcement.  Bain exited the south door in a pair of blue jeans and no T-shirt, and stated he was awakened by the knocking.  It appeared Bain had just woke up (TR. 65, 65, 324, 344-45, 361-63).

At 10:18 a.m., Investigator Elwood advised Bain of his *Miranda* rights by reading from an NSP advice of rights form (TR. 65, 324, 344-45).  Investigator Elwood read each individual right aloud, and after each right, asked if Bain understood the right or had any questions.  Bain initialed each right on the form, thereby indicating he understood the right.

Investigator Elwood read the waiver of rights section aloud and asked if Bain would agree to answer questions and waive his rights. Bain signed the waiver of rights. Investigator Carlos Trevino witnessed the advisement of rights and Bain's waiver (TR. 65, 354-58; Ex. 37). While being advised of his **Miranda** rights, Bain did not appear under the influence of drugs or alcohol, or in any physical discomfort. Bain did not ask for medical care, was not threatened, and was not promised anything in exchange for his waiver of rights. Bain appeared to understand the rights as they were read (TR. 65, 359-60).

Sergeant Edins focused on the Bain's riding arena as he drove up the driveway to approach the residence. An aerial photograph taken on July 20, 2007, depicted a light plant generator located in the riding arena, and a light plant generator was listed on the Cowboy Country inventory sheet CSP officials had obtained during the search of the white pickup. Sergeant Edins also looked for the flatbed trailer seen next to the house in aerial photographs taken on July 20, 2007. When Sergeant Edins arrived on August 1, 2007, the generator was no longer in the riding arena, and the trailer was no longer parked near the house (TR. 65, 326).

The officers did see a New Holland tractor with front-end loader located on the driveway (Ex. 42). Identification numbers for this equipment were found under a fender and called into dispatch. The dispatcher reported the tractor was stolen from Marana, Arizona (TR. 65, 327-28).

Sergeant Edins approached Bain and asked where the light plant generator and the flatbed trailer were. Bain denied ever having such items. Sergeant Edins asked about the New Holland tractor. Bain said he bought the tractor with cash in Laveen, Arizona, and had a receipt, but the receipt was in Arizona (TR. 65, 329, 360-61).

The rolling hills, canyons, and trees beyond Bain's farmstead were searched. Sergeant Edins and another officer followed some tire tracks through the gate of a fenced area east of the house and traveled back into the canyon area. The officers located a light plant generator hidden in the trees, which looked like the generator depicted in the aerial photograph taken on July 20, 2007 (TR. 65, 330-32; Exs. 42, 44). The officers continued further back into the property and eventually located a 24-foot Big Tex flatbed trailer backed into a large area of trees. The public VIN plate was missing (TR. 65, 333, 339; Ex. 43).

Manufacturers place a confidential VIN, which includes only the last four to six characters of the full VIN number, at a location on a vehicle or trailer known only to the manufacturer (TR. 64, 64-65). After the August 1, 2007 search was complete, Sergeant Edins contacted the manufacturer of the Big Tex trailer and asked for the location of its confidential VIN. Sergeant Edins followed the manufacturer's instructions, found the confidential VIN, and ran the number. The Big Tex trailer was reported stolen from Wilcox, Arizona (TR. 65, 334, 338). Through further investigation, Sergeant Edins discovered the light plant generator had also been reported as stolen from Arizona (TR. 65, 334), and a Whisper Watt generator sold by Bain to Rhonda Battalgia on June 13, 2007 (Ex. 41), was also stolen (TR. 65, 318-19, 346-47).

Pursuant to a memorandum issued by the District Attorney for the Thirteenth Judicial District of Colorado (Ex. 45), the CSP photographed the Banens trailer, TopHat trailer, HaulRite trailer, and the three ATVs and returned these items to their rightful owners (TR. 65, 335-36). Although Bain's motion to suppress does not specifically seek suppression of this evidence, Sergeant Edins testified concerning the current location, condition, and Bain's continuing ability to inspect these items of equipment. The owner of the Banens Trailer, Joe Rios, and the owner of the TopHat trailer, Daniel Binning, state those trailers have not been altered or repaired, and are available for viewing and inspection by Bain's counsel. The owner of the HaulRite trailer and the three ATVs, Mr. Donalson, has been contacted, but it is unclear whether he still possesses the HaulRite trailer and ATVs, what their current condition is, or whether he will permit them to be inspected by Bain's counsel (TR. 65, 335-36).

## LEGAL ANALYSIS

Bain's motion to suppress seeks to suppress all evidence obtained: 1) at the accident site, 2) when Bain was booked into jail, 3) by aerial surveillance, 4) during the search of Bain's white pickup on July 24, 2007, and 5) during the search of his ranch on August 1, 2007.

I.      **July 20, 2007, Accident Site**

Bain's motion seeks to suppress:

A.      All evidence obtained as the result of the warrantless search and seizure of the contents of one gray/silver Dodge Ram pickup truck, owned by Terry Ray Bain and one white Chevrolet pickup truck, owned by Terry Ray Bain, by Colorado State Patrol Officers Mark J. Amos, Craig Harris, Steve Jeffries and Captain Doug Copley on Friday July 20, 2007 following a roll over crash involving the Dodge pickup truck on Colorado Highway 71 approximately 5 miles south of Last Chance, Colorado.

B.      All statements made by Terry Ray Bain to the above-named Colorado State Patrol Officers as a result of their questioning Mr. Bain in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), such statements being further involuntary and the fruits of an illegal search and seizure and otherwise violative of the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.[4]

C.      All evidence taken from and/or provided by Terry Ray Bain to Colorado State Patrol Officers on July 20, 2007,
. . . .

**See** Filing No. 25, ¶¶ A-C.   In other words, Bain seeks to suppress the physical evidence collected by the CSP troopers on July 20, 2007, under the Fourth Amendment, and Bain

---

[4] This report and recommendation addresses Bain's claims under the Fourth and Fifth Amendments. Although Bain references the Sixth and Fourteenth Amendments in his motion, these arguments were not briefed and can therefore be considered abandoned.

Moreover, "[t]he Sixth Amendment right to counsel is triggered at or after the time that judicial proceedings have been initiated whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Fellers v. United States*, 540 U.S. 519, 523 (2004) (internal quotation marks omitted). The evidence of record does not show when, if ever, Bain was represented by counsel or that any of the government's evidence, including statements, was obtained after Bain was represented or formally charged. Similarly, although Bain's motion mentions suppression of evidence under the Fourteenth Amendment, there is no evidence or argument of selective enforcement or prosecution, and it is unclear whether a violation of the Fourteenth Amendment supports suppression of evidence. **See, e.g.,** *United States v. Armstrong*, 517 U.S. 456, 461 n.2 (1996) ("We have never determined whether dismissal of the indictment, or some other sanction, is the proper remedy if a court determines that a defendant has been the victim of prosecution on the basis of his race."). Therefore, to the extent any claims for suppression under the Sixth and Fourteenth Amendments were not abandoned, they should nonetheless be denied for lack of evidentiary and legal support.

seeks to suppress his statements made to the CSP officers on July 20, 2007, as fruit of the Fourth Amendment violations and under the Fifth Amendment.

### A.      FOURTH AMENDMENT CLAIMS

Bain seeks to suppress the evidence found at the accident site during the warrantless searches of the passenger compartment of the silver pickup, the Banens livestock trailer, and the white pickup.  As described below, these Fourth Amendment claims should be denied.

### 1.      Search of the silver pickup

On July 20, 2007, Trooper Amos responded to the report of a one-vehicle rollover accident in a desolate area of Colorado.  "Police officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions.'"  **Samuelson v. City of New Ulm**, 455 F.3d 871, 877 (8th Cir. 2006) (**quoting Winters v. Adams**, 254 F.3d 758, 763 (8th Cir. 2001)).  Local law enforcement officers "frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."  **Cady v. Dombrowski**, 413 U.S. 433, 441 (1973); **see also United States v. Smith**, 162 F.3d 1226, 1226 (8th Cir. 1998) ("The officer lawfully approached [defendant's] vehicle to investigate the traffic accident in the officer's community caretaking capacity.").

As explained by Trooper Amos, when a CSP officer responds to the report of a traffic accident, the first responsibility is locating and assisting anyone who may be injured.  When Trooper Amos arrived at the accident site, it was clear the silver pickup and attached trailer had rolled down a forty-foot embankment, but no one appeared to be present.  The person who reported the accident stated there was no cell coverage at the scene, and therefore the reporting party had left the scene, but it had taken Trooper Amos forty-five minutes to arrive and still no one was present when the officer arrived.  The pickup was upside down, extensively damaged (**see** Ex. 2), and had rolled forty feet before stopping.  Injuries were

a distinct possibility.  Trooper Amos not only acted reasonably, but had a duty to approach the accident scene and look inside the silver pickup to see if anyone was present, injured, and unable to respond, call, or wait at the roadside for help.

Even though it appeared no one had been ejected from the vehicle during the rollover, and no one was inside the vehicle, Trooper Amos had still not determined who owned the damaged vehicle and equipment.  It was clear the driver was, at the very least, missing.  The vehicle owner had an interest in securing the property and arranging for its return, and the public had in interest in clearing the wreckage out of the ditch.

The silver pickup had no visible license plate.  Trooper Amos tried to see the public VIN on the left lower dashboard, but his view was obscured by the shattered condition of the windshield.  The officer proceeded to the next logical place to find vehicle information – the glove compartment.  Based on his training and experience, Trooper Amos knew people often store vehicle registration and insurance documents in the glove compartment, and secondary VINs are often posted by the manufacturer in that location.  Trooper Amos's conduct of opening the glove compartment, looking at the contents, and retrieving the vehicle VIN number from that location was done to identify the owner of the damaged vehicle, and possibly the trailer and its equipment.  The officer's act of entering the cab of the silver pickup and searching the glove compartment was done in furtherance of his community-caretaking duties in responding at an accident scene, and was not an unlawful search in violation of the Fourth Amendment.  *Dombrowski*, 413 U.S. at 443 (holding officers did not unlawfully search the trunk of a towed car that had been "disabled as a result of [an] accident, and constituted a nuisance along the highway."); *United States v. Kimhong Thi Le*, 474 F.3d 511, 513 (8th Cir. 2007) (holding officer's act of opening the glove compartment of defendant's rental vehicle to identify the owner of a vehicle left unoccupied following a traffic accident, and conducting an inventory search prior to impoundment did not violate the Fourth Amendment).

While lawfully positioned in the cab of the silver pickup, the officer saw a black purse in plain view.  The officer opened the purse and found Swanson's billfold which contained her driver's license.  The purse and billfold were owned by Swanson, and she was driving

the pickup with Bain's consent.  Bain asserts his Fourth Amendment rights were violated by the search of Swanson's purse and billfold.

Fourth Amendment rights are personal rights that cannot be asserted vicariously. *United States v. Barragan*, 379 F.3d 524, 529-30 (8th Cir. 2004) (**citing** *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978)).  A defendant seeking to suppress evidence for alleged violations of the Fourth Amendment must demonstrate:  (1) a subjective expectation of privacy in the place searched; and (2) this expectation is one society is prepared to recognize as objectively reasonable.  *United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001).  Factors relevant to the standing determination include: 1) ownership; 2) possession and/or control of the area searched or item seized; 3) historical use of the property or item; 4) ability to regulate access; 5) totality of the circumstances surrounding the search; 6) the existence or nonexistence of a subjective anticipation of privacy; and 7) the objective reasonableness of the expectation of privacy considering the specific facts of the case. *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).  "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *Barragan*, 379 F.3d at 529.

Although Bain owned the pickup, Swanson was driving the pickup with Bain's consent, and Bain has shown no legitimate expectation of privacy in Swanson's purse and its contents.  To the extent Bain is arguing his Fourth Amendment rights were violated by the officer's act of securing Swanson's purse and looking inside, Bain's motion must be denied.  **See** *Rawlings v. Kentucky*, 448 U.S. 98 (1980) (defendant claiming ownership of drugs found in the purse of a female acquaintance did not give the defendant standing to object to the search of her purse and subsequent seizure of the drugs).

Even if Bain had standing to object to the search of Swanson's purse, the search did not violate the Fourth Amendment.  Bain and Swanson had not yet returned to the accident site when Trooper Amos opened the purse, and the officer was still attempting to determine who may have been injured in the accident and who owned the vehicle.  Such efforts were reasonable under the circumstances and did not exceed the parameters of the officer's community-caretaking duties.

Trooper Amos did not violate the Fourth Amendment by searching "the passenger compartment, glove box, purse and wallet located in the cab of the silver pickup," (Filing No. 26, ¶ 1), and Bain's motion to suppress evidence found during this search should be denied.

### 2.   Search of the Banens trailer

The silver pickup was towing the Banens trailer.  Investigator Jeffries arrived at the accident site at approximately 9:45 a.m. and entered the Banens trailer sometime before 10:35 a.m.  As a livestock trailer, the Banens trailer did not have solid walls, but rather grated walls made of pipe.  **See** Ex. 8.  The contents of the Banens trailer were, therefore, openly visible to the public.  Without entering the Banens trailer, the CSP troopers could see the trailer was hauling three ATVs.  ATVs have VINs, but the VINs could not be located and read without entering the trailer.  Bain claims his Fourth Amendment rights were violated when Investigator Jeffries entered the Banens trailer to inspect the ATVs and secure their VINs.

To the extent the contents of the Banens trailer were visible without ever entering the trailer, Bain cannot assert a Fourth Amendment claim.  "What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."  *Katz v. United States*, 389 U.S. 347, 351 (1967).  Bain lacks any legitimate expectation of privacy as to anything the public and the CSP troopers could see from the exterior of the trailer.

Bain also lacks any reasonable expectation of privacy in the public VIN affixed to the ATVs.  Public VINs are intended to be in plain view and visible to the public.  *New York v. Class*, 475 U.S. 106 (1986).  Even though Investigator Jeffries had to enter the Banens trailer to find and read the public VINs of the ATVs, this act did not encroach upon any expectation of privacy that society is prepared to recognize as objectively reasonable.  *Class*, 475 U.S. at 114 (holding an officer did not violate the defendant's Fourth Amendment rights by reaching into an automobile to move papers on the dashboard so the officer could read the VIN).

Even if Bain has standing to raise a Fourth Amendment claim regarding entry into the Banen's trailer, the warrantless entry was permissible under the "automobile exception"

to the warrant requirement. Under the "automobile exception," the warrantless search of vehicles is constitutional if, before the search began, the officers had probable cause to believe the vehicle contained evidence of criminal activity. *United States v. Brown*, 550 F.3d 724, 727 (8th Cir. 2008). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (**quoting** *United States v. Kennedy*, 427 F.3d 1136, 1140-41 (8th Cir. 2005)).

By the time Investigator Jeffries entered the Banens trailer, the officers had accumulated the following information:

- The silver pickup had no license plate or current registration.

- Based on the VIN, Bain owned the silver pickup, yet he initially stated Swanson owned the pickup.

- Trooper Harris could not find VINs on any of the trailers at the accident site.

- Trooper Amos noticed only rivet holes where he expected to find the VIN for the Banens trailer.

- Instead of seeing data plates and decals on the neck of the TopHat trailer, Trooper Amos and Investigator Jeffries saw sanding swirls and apparently new paint, and both officers smelled the odor of fresh paint.

- Trooper Amos and Investigator Jeffries noticed grind marks and apparently fresh paint on the HaulRite where a manufacturer's sticker would likely have been.

- The Arizona license plate on the trailer manufactured by TopHat was for a homemade box trailer, not a manufactured trailer, owned by a person named Klyn from Apache Junction, Arizona.

- An anonymous caller had reported the property at the accident site was stolen.

Bain argues the "recently painted" areas noticed by Trooper Amos and Investigator Jeffries cannot be properly considered in any probable cause analysis because the officers

lack expertise and any scientific basis for concluding the paint was applied "recently." **See** Filing No. 81 (**citing** *Daubert v. Merrill Dow Pharms. Inc.*, 509 U.S. 579 (1993)).  As Trooper Amos and Investigator Jeffries acknowledged on cross-examination, the type of paint used, and the temperature and humidity of the environment, can effect how long it takes for paint to dry or the smell of fresh paint to dissipate, and neither officer could state when the paint was actually placed on the trailer decals (TR. 65, 240-41, 288).

However, a probable cause determination rests on what the officer reasonably would know or believe at the time the event occurred.  *United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999).  An objectively reasonable belief as to the facts, even if mistaken, can provide probable cause to believe a crime is being committed.  *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005) ("[T]he validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one.").

Therefore, the question before this court on Bain's motion to suppress is whether a reasonable officer in the position of Trooper Amos and Investigator Jeffries would have concluded the paint looked or smelled fresh, and appeared recently applied to cover manufacturer-affixed decals or data plates.  Trooper Amos and Investigator Jeffries were trained to look for such changes when investigating potentially stolen property.  Both noticed what appeared to be an after-market application of paint over sanding swirls or a roughly ground surface where the officers expected to see manufacturer decals and data, and both officers smelled paint.  An objectively reasonable officer in Trooper Amos's and Investigator Jeffries's position would believe someone had used sanding, grinding, and paint in an attempt to conceal the actual identity and description of the TopHat and HaulRite trailers, and the officers were entitled to consider these observations in assessing probable cause.

Based on the officers' training and experience, and the totality of information Trooper Amos, Trooper Harris, and Investigator Jeffries observed and learned before Investigator Jeffries entered the Banens trailer, the CSP officers had probable cause to believe Bain was in possession of and transporting stolen property.  The nonconsensual warrantless search of the Banens trailer did not violate the Fourth Amendment.

### 3. Search of the white pickup on July 20, 2007

To the extent Bain is claiming his Fourth Amendment rights were violated by the warrantless search of the white Chevrolet pickup truck on July 20, 2007 (Filing No. 25, ¶ A), the evidence does not support this claim. During the July 20, 2007 on-site investigation, Bain retrieved documents from the white pickup when asked why he was driving a pickup that belonged to "Joe Clem," and when Trooper Amos told Bain about the anonymous phone call. However, the CSP troopers did not enter the white pickup and search it while at the accident site. The white pickup was searched pursuant to a warrant on July 24, 2007.

To summarize, the CSP officers did not violate Bain's Fourth Amendment rights during the investigation of the accident scene on July 20, 2007.[5]

### B. Statements made to CSP troopers on July 20, 2007

Bain seeks to suppress all statements he made to Troopers Amos and Harris, Investigator Jeffries, and Captain Copely, "as a result of their questioning . . . in violation of **_Miranda v. Arizona_**, 384 U.S. 436 (1966), such statements being further involuntary and the fruits of an illegal search and seizure. . . ." Filing No. 25, ¶ B.

Since Bain's Fourth Amendment rights were not violated during the on-site investigation on July 20, 2007, Bain's statements during that investigation cannot be suppressed as fruit of an illegal search or seizure. Bain claims, however, that certain statements he made and information he provided must be suppressed under the Fifth Amendment. Bain argues:

> Although it was at all times clear to Mr. Bain, as it would have been to any reasonable person that he was not free to leave and was in custody, Colorado State Patrol officers continued to question him about the anonymous telephone call and his involvement with the stolen property. Such questioning occurred at the scene as well as during transport to and at the Washington County Jail. Mr. Bain's statements in response to such questioning were obtained without adequate warning and

---

[5] Bain's motion does not appear to raise an unlawful detention claim. Even if such a claim had been raised, as explained hereafter when discussing the "in custody" element of Bain's Fifth Amendment challenge, Bain was not detained until the officers had probable cause to arrest. Bain was not unlawfully detained on July 20, 2007.

valid waiver of rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

Filing No. 26, ¶ 6. Bain claims he handed a receipt from Moore and Molias Equipment to Trooper Amos in response to questioning about the anonymous telephone call and his connection to the stolen property, and this questioning occurred while Bain was in custody and without first advising Bain of his rights under *Miranda*. Filing No. 79, pp. 3-6.

Based on the evidence, Bain never talked to Investigator Jeffries or Captain Copely. Further, there is no evidence Bain was questioned at the accident site after being directed to sit in Trooper Harris's patrol vehicle, en route to the Washington County Jail, or while in the custody of the Washington County Jail. Therefore, the issue is whether Bain was subjected to custodial interrogation in violation of the Fifth Amendment when Trooper Amos told Bain about the anonymous phone call.

*Miranda v. Arizona*, 384 U.S. 436 (1966) requires that a suspect be warned of his rights under the Fifth Amendment prior to being interrogated while in custody. *United States v. Elzahabi*, 2009 WL 538880, at *2 (8th Cir. Mar. 5, 2009). A person is "in custody" for the purposes of *Miranda* when "placed under formal arrest, or when his or her freedom is restricted to a degree akin to formal arrest." *Id.* The factors for determining whether a person is in custody include: (1) whether the suspect was informed during the interview that the questioning was voluntary, that he could ask the officers to leave, or that he was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect voluntarily acquiesced to official questioning or initiated contact with authorities; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether there was a police-dominated atmosphere; and (6) whether the suspect was placed under arrest at the termination of the questioning. *Id.* (**citing *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)**). "These factors are not exclusive; custody 'cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly.'" *Id.* (**quoting *United States v. Czichray*, 378 F.3d 822, 827-28 (8th Cir. 2004)**).

Prior to being placed in Trooper Harris's vehicle, Bain's movements were never restricted. Bain was not truly detained, much less in custody, during the vast majority of the

officers' investigation of the accident site.  Bain had left the accident scene and returned of his own volition.  When Swanson was being questioned by Trooper Amos, Bain drove off, on his own and of his own initiative, to turn the white pickup and rig around and park it in the abandoned coral area.  Bain walked back to talk with Trooper Amos.  Trooper Amos offered to call a tow truck to clear up the accident site, but Bain chose to stay and do the work himself.  Thereafter, Bain moved about without an escort and, with the assistance of his brother-in-law and the use of the John Deere skid steer, worked to clear up the site.

Bain initiated his only contact with Trooper Harris.  When Trooper Harris was in the ditch and looking for VINs on the trailers, Bain approached Trooper Harris and asked what the officer was trying to find.  Trooper Harris stated he could not find VINs and asked if Bain knew where they were located on the trailers.  After Bain denied knowing the location of the VINs, he walked away to continue the cleanup process.

At approximately 10:38 a.m., Trooper Amos advised Bain of the anonymous phone call, and when Bain said he had no idea what the officer was talking about, Trooper Amos asked if Bain had any paperwork to prove ownership.  Bain walked to the white pickup, unescorted, looked around for a period of time, and returned with a receipt from Moore and Molias Equipment (Ex. 29).  Trooper Amos called the tow truck at 11:15 a.m. and then approached Bain and directed him to sit in Trooper Harris's vehicle.  Trooper Amos used no strong arm tactics, and made no promises or threats in order to obtain information from Bain.  There were four law enforcement officers at the scene, but Bain was not alone with them.  Bain's brother-in-law and nephew had been present up until the accident site was cleaned up, and Swanson was sitting in Trooper Amos's patrol vehicle when Trooper Amos advised Bain of the anonymous phone call.  Although the site cleanup was complete, and Bain was not told he could leave, he was also never told he could not leave.  Bain appeared in good health, and was given food and water at the site.  Bain never asked if he was under arrest, and never asked for a lawyer.

Bain argues the officers knew, as of 10:35 a.m., that the John Deere skid steer was stolen and Bain would be arrested.  From this fact, Bain argues "any reasonable person in Mr. Bain's position would have felt that these circumstances restricted his freedom" to a "degree akin to a formal arrest."  However, Bain was not told, and had no way of knowing

the officers knew the John Deere skid steer was stolen.  Even if the officers were planning to arrest Bain when Trooper Amos told Bain about the anonymous call, the officers' unexpressed intent and Bain's subjective fear are not relevant in deciding whether a reasonable person in Bain's position would have believed he was in custody.  Rather, the court must consider the totality of the circumstances "while keeping in mind that the determination is based on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  *United States v. Martinez*, 462 F.3d 903, 909 (8th Cir. 2006).

At the time and under the circumstances existing and known to Bain when Trooper Amos talked to Bain about the anonymous phone call, a reasonable person in Bain's position would not have believed he was under arrest, or that his freedom was restricted to a degree akin to formal arrest.  Bain was not subjected to custodial interrogation when told about the anonymous call and asked to produce any documentation of ownership.  Bain's Fifth Amendment challenge to the admissibility of documentary evidence, including the Moore and Molias receipt (Ex. 29), and statements provided in response to this questioning should be denied.

## II.     July 20, 2007, Pat-Search of Bain at Jail

Probable cause existed to arrest Bain for possession and transport of stolen property.  Bain was transported to the Washington County, Colorado, Jail for detention following his arrest and was pat-searched during booking.  Bain seeks to suppress "a white envelope containing a glass pipe and tin foil allegedly seized from Mr. Bain at the Washington County, Colorado jail" when Bain was booked into the jail.

An arrested person can be lawfully pat-searched upon arrival at the detention facility.  *United States v. Edwards*, 415 U.S. 800, 803 (1974).  To the extent Bain is claiming he was not lawfully arrested, and any items seized during the post-arrest pat-search are fruit of Fourth Amendment violations that occurred at the accident site, the motion must be denied because no Fourth Amendment violations occurred.  To the extent Bain claims suppression is necessary as fruit of the officer's alleged failure to provide *Miranda* warnings as required under the Fifth Amendment, the motion must be denied.  There was no

*Miranda* violation, and no showing that any statement made by Bain at the accident site was involuntary. The Fifth Amendment provides no basis for suppressing physical evidence obtained as the fruit of a voluntary statement, even if the statement itself is inadmissible under *Miranda*. *United States v. Villalba-Alvarado*, 345 F.3d 1007 (8th Cir. 2003).

### III.   July 24, 2007, Search of the White Pickup

Bain seeks to suppress:

> All items observed or seized pursuant to the execution of a search warrant by Colorado State Patrol Officers Amos and Jeffries on July 24, 2007 including, according to Trooper Amos "papers and other materials in the Chevrolet pickup that did show Mr. Bain's involvement in the stolen property that we recovered," and a handwritten inventory list on a yellow sheet of paper seized from the Chevrolet pickup during the search.

Filing No. 25, ¶ E.  Investigator Jeffries signed the warrant application (Ex. 30) on July 24, 2007.  The warrant application described the information obtained during the on-site investigation on July 20, 2007, and further included the following facts arising or discovered after Bain was instructed to sit in Trooper Harris's vehicle:

- Trooper Amos located the confidential VIN for the Banens trailer, traced the VIN, and found the Banens trailer was reported as stolen from El Paso, Texas.

- The Phoenix Police Department reported there was no business called "Moore and Molias Equipment" in Phoenix, Arizona.

- Bain was arrested for Theft by Receiving and Possession of removed or altered motor vehicle identification numbers.

- When J-R's Towing removed the property from the site, the white pickup would not run properly and was overheating.  J-R's towing used a water jug located in the pickup to fill the radiator, and found a pipe consistent with smoking contraband inside the jug.

- Bain had a white envelope containing a glass pipe and tin foil on his person when he was booked into jail.

31

Ex. 30.  Bain does not claim the warrant to search the white pickup was based on intentionally or recklessly misstated information or concealed material information, or that the warrant was not issued by a neutral and detached judge upon consideration.  **See Franks v. Delaware**, 438 U.S. 154 (1978).

Bain argues the evidence during the search of the white pickup must be suppressed as "fruits of the prior warrantless search, seizure and unlawful custodial interrogation of Mr. Bain on July 20, 2007."  Filing No. 25, ¶ E.  Since no Fourth or Fifth Amendment violation occurred, the warrant is not the fruit of a Fourth or Fifth Amendment violation.

Bain further claims the documents photocopied and returned to the pickup cab, and not listed on the inventory, must be suppressed because they were "not seized pursuant to the execution of the search warrant. . . ."  Filing No. 79, p. 6.  The $1300 check written by Steve Ries with "Welder Generator" written in the memo line, and the $3500 check for a Whisper Watt generator written by Rhonda Battalgia, were among the documents copied and returned (Ex. 41).

Federal Rule of Criminal Procedure 41 does not apply in this case because federal authorities were not involved in applying for or executing the warrant.  **See United States v. Bieri**, 21 F.3d 811, 816 (8th Cir. 1994).  There is no evidence of record explaining Colorado law applicable to warrant returns and inventories.  The Colorado Court has held however, that the requirements of its criminal rule "relating to the making of the return and inventory are ministerial in nature and a failure to comply does not render the search warrant or the seizure of the property pursuant thereto invalid."  **Colorado v. Schmidt**, 473 P.2d 698, 702 (Colo. 1970).  Colorado law is consistent with the vast majority of courts. "[T]he procedures required for return of a search warrant are ministerial and, absent a showing of prejudice, irregularities in such procedures will not serve to void an otherwise valid search."  **United States v. Kennedy**, 457 F.2d 63, 67 (10th Cir. 1972) (collecting cases).

Even if federal law applied, Bain's argument must fail for lack of any showing of prejudice or reckless disregard for proper procedure.  "We apply the exclusionary rule to violations of Rule 41 only if a defendant is prejudiced or reckless disregard of proper procedure is evident."  **United States v. Hornbeck**, 118 F.3d 615, 617 n.4 (8th Cir. 1997)

(**quoting** *Bieri*, 21 F.3d at 816, and **citing** *United States v. Freeman*, 897 F.2d 346, 349 (8th Cir. 1990), and *United States v. Burgard*, 551 F.2d 190, 193 (8th Cir. 1977)).

Bain has a bates-stamped copy of the documents found, copied, and returned to the white pickup.  The United States Attorney now possesses the originals and they are available for review.  Bain was not prejudiced by the CSP officers' failure to list the copied documents on an inventory sheet.

## IV.   July 20, 2007, Aerial Surveillance of Bain's Ranch

Bain moves to suppress "[a]ll observations made during a warrantless flyover of Mr. Bain's property in Nebraska by the Nebraska State Patrol Airwing on July 20, 2007."  Filing No. 25, ¶ D.  Bain's briefs do not explain the constitutional basis of this challenge.

Bain is apparently claiming his Fourth Amendment rights were violated when Sergeant Kevin Ryan, of the NSP Air Wing, flew a plane over his ranch and took photographs.  **See** Exs. 33 & 34.  The photographs depict Bain's roping arena and Bain's house and outbuildings.  These aerial photographs were taken "in a physically nonintrusive manner" and show what "[a]ny member of the public flying in this airspace who glanced down could have seen" had he or she flown over the property.  *California v. Ciraolo*, 476 U.S. 207, 213-14 (1986).  Bain had no legitimate expectation of privacy in the areas photographed.  *Id.*  Bain's motion to suppress the aerial photographs, and the evidence derived from those photographs, should be denied.

## V.   August 1, 2007, Search of Bain's Ranch

Bain moves to suppress:

> All items seized and all observations made during the execution of a search warrant at Mr. Bain's residence and property . . . on August 1, 2007 . . . because the warrant was tainted by and reliant upon the fruits . . . of the prior warrantless search, seizure and unlawful custodial interrogation of Mr. Bain on July 20, 2007.

Filing No. 25, ¶ F.

The warrant application (Ex. 35) was signed by NSP Sergeant Edins and included facts and information obtained by the CSP officers on July 20, 2007, and during their search

of the white pickup on July 24, 2007.  In addition, the application explained that the items depicted on the aerial photographs of the ranch taken on July 20, 2007, appeared to be listed on the inventoried document (Ex. 32) obtained during the search of the white pickup, and that the checks (Ex. 41) written by Steve Ries and Rhonda Battalgia to Bain were in payment for property stolen from locations in Arizona.  Finally, the application stated Bain was previously convicted of larceny and spent six years incarcerated at the Community Corrections Center in Lincoln, Nebraska.

None of the information in Sergeant Edins's warrant application was obtained in violation of the Fourth or Fifth Amendments.  Bain's motion to suppress evidence found during the search of Bain's ranch, conducted pursuant to a warrant on August 1, 2007, should be denied.

## VI.    Statements Made by Bain During the Search of his Ranch.

Bain claims he was subjected to custodial interrogation in violation of *Miranda* while the search of his ranch was being conducted.  The government claims Bain was advised of his *Miranda* rights and waived those rights.

The government bears the burden of proving by a preponderance of the evidence that the defendant's waiver of *Miranda* rights was an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a known right or privilege.  *United States v. Black Bear*, 422 F.3d 658 (8th Cir. 2005).  A waiver is "knowing and intelligent" if it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right.  A waiver is "voluntary" if it was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception.  *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005).

The ultimate question is whether the defendant's will to remain silent was overborne and his capacity for self-determination critically impaired.  *United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002).  In reaching this decision, the court should consider the suspect's age, general intelligence and education; whether he was intoxicated or under the influence of drugs when consenting; whether he consented after being informed of his right to withhold consent or of his *Miranda* rights; and whether, because he was previously

arrested, he was aware of the protections afforded to suspected criminals by the legal system. *United States v. Griffith*, 533 F.3d 979, 984 (8th Cir. 2008).

Bain is an adult. Bain was awakened on August 1, 2007, when the officers arrived to search his residence, but he appeared alert, healthy and not under the influence of any drugs or alcohol when advised of his *Miranda* rights. The *Miranda* rights were individually read aloud to him and he was given the opportunity to ask questions. He asked no questions and initialed that he understood each right. The waiver of rights was also read aloud, and Bain signed the waiver (Ex. 37). No one promised anything or threatened Bain to secure his consent to respond to questions. Bain was aware of his *Miranda* rights – he had been tried and convicted of larceny before.

Bain voluntarily, knowingly, and intelligently relinquished his *Miranda* rights. His statements in response to questioning during the search of his ranch on August 1, 2007, should not be suppressed.

## VII.    The Returned Equipment.

Based on the evidence presented at the hearing, the government has photographs of the Banens trailer, TopHat trailer, HaulRite trailer, and the three ATVs, but these items have been returned to their owners. The conditions of the Banens and TopHat trailers has not changed, and they can be inspected by Bain's counsel. However, the HaulRite trailer and the three ATVs may no longer be available for inspection. The equipment was returned pursuant to a memorandum issued by the District Attorney for the Thirteenth Judicial District of Colorado (Ex. 45).

Bain may be claiming the government failed to preserve discoverable evidence, resulting in a denial of Bain's right to due process of law. However, if the evidence sought is "only potentially useful, as opposed to clearly exculpatory, a criminal defendant must prove bad faith on the part of the police to make out a due process violation." *United States v. Houston*, 548 F.3d 1151, 1155 (8th Cir. 2008) (**citing** *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.")).

There is no showing the items returned by the CSP officers would be exculpatory; the photographs in evidence clearly contradict that notion. Bain has offered no evidence indicating he will be prejudiced if he cannot personally inspect the physical evidence. At most, Bain may find an inspection of the returned equipment useful in preparing a defense. However, Bain has not made any showing that the CSP officers acted in bad faith when they returned the stolen trailers and ATVs to their owners. The CSP officers acted in accordance with instructions received from the Colorado prosecuting attorney, and obtained several photographs of the evidence before it was returned. Those photographs have been provided to Bain's counsel.

To the extent Bain may be claiming his due process rights were violated when the trailers and ATVs were returned, this claim should be denied.

### IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:

Terry Ray Bain's motion to suppress (Filing No. 25) be denied.

### ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 1st day of April, 2009.

BY THE COURT:

s/Thomas D. Thalken
United States Magistrate Judge

36